---

(No. 13546.—Reversed in part and remanded.)
FRANKLIN D. KELLY *et al.* Appellants, *vs.* EDWIN LEH-
MANN *et al.* Appellees.

*Opinion filed February 15, 1921—Rehearing denied April 7, 1921.*

1. CORPORATIONS—*forfeiture for non-user can only be set up by State in direct proceeding.* A corporation organized for the purpose of operating safety deposit boxes is a lawful corporation, and a failure to file its annual report with the Secretary of State will not, of itself, work a forfeiture of the corporation's charter but is simply *prima facie* evidence of non-user, which may be availed of only by the People in a proceeding to forfeit the charter and cannot be set up in a collateral proceeding for the purpose of avoiding a conveyance.

2. DEEDS—*proof that deed is a mortgage must be clear, satisfactory and convincing.* The burden is upon the party alleging that an instrument purporting to be a deed is, in fact, a mortgage, to prove his case by clear, satisfactory and convincing evidence.

3. SAME—*when parol evidence is admissible to prove deed is a mortgage.* To determine whether a deed purporting to convey an absolute estate was in fact intended to be a mortgage, equity as well as the law will seek for the understanding of the parties in the deed itself; but parol evidence is admissible so far as it conduces to show the relations between the parties, to establish the fact that a debt existed or that money was loaned on account of which the conveyance was made, or any other circumstance which will in a court of equity control the operation of the deed.

4. SAME—*character of deed or mortgage becomes fixed upon delivery.* The character of an instrument as a deed or mortgage

becomes fixed at the time of its delivery, and where the purchaser gives the vendor an option to buy the property within a certain time, an extension of the option at the expiration of the period will not change the character of the original conveyance.

5. SAME—*an option to re-purchase does not convert absolute conveyance into mortgage.* A mere option to re-pay the purchase money and receive a conveyance of the property will not convert an absolute deed into a mortgage although the vendee agrees to advance a certain sum to the vendor in addition to the expressed consideration, to be drawn by the vendor either before or after the expiration of the option period, when said sum is to be added to the option price.

6. SAME—*what is necessary to give an absolute deed the character of a mortgage.* To fix upon a deed absolute in form the character of a mortgage it must be shown to have been intended as a security in the nature of a mortgage to cover a continuing valid indebtedness which may be enforced in an action at law.

7. SAME—*when there is no existing valid indebtedness which will render a deed a mortgage.* Where a vendor is given an option to re-purchase and assigns his option to a third party, who purchases the property and takes the title in his own name under a verbal agreement that he will help his assignor out of straightened circumstances, there is no existing valid indebtedness between the third party and the assignor of the option which will give the assignor a right to redeem as under a mortgage.

8. TRUSTS—*when a resulting trust does not arise—Statute of Frauds.* No resulting trust arises where a party who holds an option to purchase property assigns his option to a third party, who buys the property with his own money or on his own security and takes the title in his own name, and a mere verbal agreement that the property is to be held in trust until the assignor of the option can pay the purchase price, with interest, is open to the defense of the Statute of Frauds.

9. SAME—*what necessary to constitute a resulting trust.* A resulting trust cannot arise from any verbal agreement between the parties or verbal declaration at the time of the purchase, but it arises from the fact that one person has paid the consideration, or some aliquot part thereof, as a part of the original transaction at the time the purchase was made and the title has been taken in the name of another.

10. EQUITY—*when equity will enforce promise constituting consideration for assignment of option.* A court of equity will enforce the performance of the consideration for an assignment of an op-

tion to purchase valuable business property where the assignee has promised to contribute to the support of the assignor with funds from the income of the property, which promise was the moving consideration for such assignment.

STONE, J., took no part.

APPEAL from the Appellate Court for the Second District;—heard in that court on writ of error to the Circuit Court of Peoria county; the Hon. NORMAN L. JONES, Judge, presiding.

CHARLES R. HOLDEN, R. M. BARNES, J. H. MAGOON, and WALLACE J. BLACK, for appellants.

QUINN & QUINN, and MANSFIELD & COWAN, (SHERMAN C. SPITZER, of counsel,) for appellees.

Mr. JUSTICE THOMPSON delivered the opinion of the court:

This appeal is from a judgment of the Appellate Court for the Second District affirming a decree of the circuit court of Peoria county dismissing for want of equity the amended bill filed by Franklin D. Kelly and Marguerite Dorrance against Edwin Lehmann and Minnie R. Lehmann, his wife, by which complainants sought to redeem certain premises in the city of Peoria at the westerly corner of Jefferson avenue and Main street, extending 54 feet on Jefferson avenue and 111 feet on Main street, formerly known as the Old Library building. Edwin Lehmann (hereinafter called defendant) held the record title in fee. Mrs. Lehmann had no interest in the premises except such as arose out of the marriage relation, and for the purposes of this opinion it will not be necessary to take further notice of her interests. Defendant answered the amended bill, denying that complainants had a right to redeem and setting up the Statute of Frauds. Complainants filed a general replication, and the cause was referred to a special master in chancery, who heard the evidence and reported his findings

of fact and conclusions of law. The master found for defendant, overruled objections filed by complainants and filed his report. On application of complainants a change of venue was granted from all the judges of the tenth judicial circuit, and the cause was heard by Hon. Norman L. Jones, of the seventh judicial circuit. The chancellor overruled exceptions filed to the master's report and dismissed the amended bill for want of equity. This decree was affirmed by the Appellate Court by operation of law, one of the justices (a judge of the circuit court of the tenth judicial circuit from whom a change of venue had been taken) taking no part and the remaining justices being unable to agree. A certificate of importance was granted and this appeal perfected.

About thirty-five years ago Franklin D. Kelly came to Peoria and established with W. A. Gray the Painless Dental Parlors. Marguerite Dorrance solicited business for this establishment and for about twenty-five years has been closely associated with Kelly. About 1894 Kelly and Gray purchased the property in question from the Mercantile Library Association. Title was taken in the name of Gray, but Kelly claims Gray held one-half interest in trust for him. In 1895 Kelly filed a sworn answer to a bill filed in the circuit court of Peoria county by Holland & Holland to discover property of Kelly to satisfy certain judgments against him. By this answer Kelly denied that he had any interest in the property in question or the dental business and stated that he was an agent and employee of Gray. In 1908 Kelly acquired the fee to the premises in question and placed successive incumbrances thereon. In 1911 all incumbrances of record were merged in a foreclosure decree for the amount of $103,022.37. Kelly in 1909 organized a corporation known as the First Trust and Safe Deposit Company, the object of which was "to accept and execute trusts, to receive funds for investment and to invest the same, to do a brokerage business, and to maintain and op-

erate a system of safe deposit vaults." Kelly subscribed for practically all the 2500 shares of stock of a par value of $100 each, and paid for the same by conveying to the corporation by warranty deed the premises here involved, subject to incumbrances totaling $95,000. Later, Dorrance quit-claimed to the deposit company all of her right, title and interest in said premises. The foreclosure decree was entered September 23, 1911, and on October 9, 1911, Kelly submitted a written proposition to one Webb, who owned a lot fronting 60 feet on Main street immediately northwest of and adjacent to the property in question, in which he stated that he was the owner of all the capital stock of the deposit company and that the corporation owned in fee the premises in controversy subject to the foreclosure decree, and offering in consideration of $125,000 to sell the property through the corporation to Webb, and offered to cause to be conveyed to Webb, by warranty deed from the deposit company, the Old Library building, free and clear of all incumbrances. In a subsequent communication Kelly stated that Webb's acceptance of his offer would not create an indebtedness from Kelly or the deposit company to Webb, and that the title to be conveyed was to be an absolute title in fee simple and was not under any circumstances to be considered as a mortgage. The purchase price of $125,000 was sufficient to pay all of Kelly's indebtedness evidenced by notes and judgments and would leave a balance of a few thousand dollars in cash. Kelly's offer provided further that Webb was to give Kelly the right to purchase said premises any time within eighteen months for the sum of $137,000. Kelly stated specifically in writing that such option was not, in connection with the conveyance to Webb, to be deemed or held to create or establish any security for an indebtedness, or in any way to make the deed, absolute on its face, a mortgage. October 11, 1911, Webb accepted the proposition and bought the Old Library building from the corporation, its owner. The record title

showed Webb the owner in fee simple of the premises in question. Kelly occupied offices on the second floor of the building as a tenant of Webb under a written lease from October 23, 1911, to April 9, 1913, the date of the expiration of Kelly's option to re-purchase the property. Kelly did not exercise his option to purchase the premises for $137,000, but on April 8, 1913, he secured from Webb an extension of the time for exercising the option until three P. M. November 1, 1913, the purchase price, however, to be $153,000 in cash. One hundred and fifty thousand dollars was to be the purchase price of the property and $3000 was a deposit with Webb, which Kelly had a right to take down at any time before November 1, 1913, with the understanding that if the deposit was drawn and the option exercised the $3000 must be re-paid. Complainants negotiated with various financial institutions and wealthy individuals in an effort to secure sufficient money to re-purchase this property and to repair or replace the building. Before the conveyance to Webb, the building, which was three stories high, had been seriously damaged by fire. The roof was temporarily repaired but the top floor was practically unfit for use thereafter. All the efforts of complainants to raise money had failed, and in June, 1913, Dorrance, on behalf of complainants, entered into negotiations with defendant.

In addition to complainants' financial difficulties concerning the Old Library building, complainant Dorrance was about to lose her home at 216 Moss avenue, Peoria. This property was sold for $6607.47 March 29, 1913, under a decree theretofore entered, and defendant redeemed the property through a judgment creditor, Andrew J. O'Neill, June 27, 1914, for the sum of $7127.87. We recite these facts at this point because the redemption of the Moss avenue homestead figures in the transaction regarding the Old Library building, and the materiality will appear in the recital of the evidence of the several witnesses. The

negotiations between complainants and defendant resulted in the assignment by complainants to defendant of their option to purchase the Old Library building from Webb and the transfer of the property from Webb to Lehmann for the sum of $153,000 paid by Lehmann to Webb. Lehmann furnished $50,150 from his own funds, $100,000 which he had borrowed from the Massachusetts Mutual Life Insurance Company of Springfield, Massachusetts, and complainants $2850, which they had obtained from Webb by withdrawing the $3000 in accordance with the terms of the option. Inasmuch as the ultimate issue to be determined in the case is the character of this transaction between complainants and defendant we will set out in some detail the evidence of the principal witnesses.

Marguerite Dorrance, one of complainants, testified that she met defendant in June, 1913, at his place of business; that she related in detail her previous negotiations with reference to securing a loan upon the Old Library building; that at a later conversation between them defendant advised her that he would assist her; that she told defendant that the indebtedness of record was $153,000, but if he would furnish $50,000 she could get the $100,000 from an insurance company and that Webb was indebted to her in the sum of $3000. Witness then related conversations had by her in the presence of defendant with various other parties who were witnesses in the case, but we will not repeat her testimony in that particular. She further testified that as defendant was leaving for the East to obtain the loan from the insurance company witness said to him, "Good luck go with you, and telegraph us just as soon as the loan is closed, but do the very best you can for us;" that complainants' Exhibit 1 is the telegram received. It reads:

"SPRINGFIELD, MASS., *June 24, 1913.*

"*Franklin D. Kelly, Auditorium Hotel, Chicago:*

"Arranged for hundred fifty thousand conditions very severe.

ED LEHMANN."

She further testified that after defendant returned from the East she saw defendant and asked him about the loan, and defendant replied: "It was on·little more severe lines than we had expected, Miss Dorrance; they would not raise the $100,000 to $125,000, as we hoped they would; they insisted on my taking the title;" and that defendant told her he replied to them, "I thought any two people that had earned the property and held the property in face of the struggles that you had and had judgment enough to purchase in its early stage of valuation were entitled to hold the property, and that I was willing to stand for you and sign any papers that were necessary, but they still insisted that I take the property over;" that she then replied, "Mr. Lehmann, I would deed you anything in the world we have, we have that much confidence in you; I want you secured for all the money you are putting in there; we are willing to allow that to remain in trust until you are paid in full." Witness further testified that before the consummation of the deal with defendant she told him she had received a telephone message from a Miss Theulis, a close friend of hers, in which she requested that complainants should not sign any papers until her arrival; that upon her arrival witness discussed the matter with her, and that she, Miss Theulis, offered to assist the complainants in the erection or purchasing of the building or extending the loan; that a few days later defendant called complainants to come down and complete arrangements for the loan; that Springer, the Chicago°representative of the insurance company, was present and said: ":Dr. Kelly and Miss Dorrance, our company has decided that you must pass an absolute deed to Mr. Lehmann before they will consent to make a loan on your property; they do not care to make a loan where any title is held as was proposed by you to Mr. Lehmann, and as you have every confidence in Mr. Lehmann there would be no danger in your passing an absolute title;" that complainant Kelly said: "We have ab-

solute confidence in Mr. Lehmann, and I am willing to pass whatever papers Mr. Springer says are necessary to procure this loan; I am about weary of this title disturbing our loans and am willing to pass the title to Mr. Lehmann for that purpose," and that Springer said, "The Lehmanns are bright business men and from a business standpoint could handle things better than you could." Witness further testified that a discussion followed as to the architect, and that Springer then said, "You folks don't have to disagree; you can get together on this proposition," and complainant Kelly said, "I am willing to get together with Lehmann and everything will be agreeable, but I do not acquiesce;" that Springer replied, "Then it is agreeable to you, doctor, to pass the title to Mr. Lehmann, as required by the company to make the loan?" and complainant Kelly replied, "I am willing to pass any papers to Mr. Lehmann to make the loan." Witness further testified that title was passed to defendant October 15; that witness advised Lehmann that she was half owner of the property in question, but she did not know that the fact did not so appear of record. Witness further testified that on the morning of October 15 Springer and defendant and Hopp, representative of the Chicago Title and Trust Company, called at her home; that witness remarked, "Well, I guess we will be out of our trouble after to-day," and that she then remarked to Springer, "Remember to make that loan payable at any interest-bearing period or any part thereof," and that she again admonished Springer to make the loan payable at any interest-bearing period; that the loan did not suit her and that she was going to pay it off as soon as possible, and that he replied, "I hear you," but that Lehmann made no statement; that after they went out Lehmann said, "We will see you later in the day at the office;" that later in the day a lease was presented to complainant Kelly for his signature, and after handing it to Gray, attorney for complainants, and Gray telling him it was all

right, witness then again remarked to Springer, "Don't forget what I told you about making this payable at any interest-bearing period." Witness further testified that she was not present when the deed was signed; that she saw defendant in a day or two, and that she had Gray draft an agreement which she handed to defendant and remarked: "Mr. Lehmann, I can only say, as I have always said before, that the doctor and I have absolute confidence in you, but in case of sickness, accident or death I think it would be no more than right that we have a little article of agreement from you showing that you have taken this property in trust for us and will hold it as such until you receive your money or until we pay you in full and the Massachusetts Life, as you are on the notes for us to that company; I have asked Mr. Gray to draw a little memorandum to that effect for me; it is nothing that will appear on the records; we don't ask to have it made a matter of record, but only in case of death so we will be able to show this is our property and we have the right of redemption of the same by paying off the Massachusetts Life and the $50,000 we owe you;" that defendant replied, "I am perfectly willing to sign that myself, as this is only a matter of trust, but I have agreed with the Massachusetts Life that until we get the money we are to have, that there is to be no papers passed between us; I am perfectly willing myself to sign that article;" that witness replied: "This cannot interfere, because it says, 'When we pay the Massachusetts Life and you your $50,000, or whatever we owe you, that you will deed our property back to us,' " and defendant replied: "All right; I will just take this over and have my attorney look at it, Miss Dorrance; I am willing to sign it if it does not interfere with my agreement with the Massachusetts Life." Defendant took the papers but never returned them. The next time witness saw defendant she told him that she had heard that he was going to put up a building on the premises and that Hotchkiss & Harris were drawing the plans.

and Jobst was going to erect the building, and he replied
there was nothing to it. Witness further testified that on
an occasion after the defendant received the deed to the
property he said: "I have always been willing to sign that;
I am only holding this in trust for you people, but I have
told the Massachusetts Life there was nothing passed be-
tween us in writing until we had all of the money we were
to get from them; I have talked with my attorney about it
before, and he said it would not do; I only done it from
the standpoint I had agreed with the Massachusetts Life,
and if it is all right to sign an article of that kind I want
you satisfied." It was after this that witness decided to go
to the head office of the Massachusetts Mutual Life Insur-
ance Company at Springfield, Massachusetts. After she
returned from seeing the officers of the insurance company
witness saw defendant again and defendant remarked that
he heard witness had been to Massachusetts, and that wit-
ness replied: "Yes, I wanted to see why the loan was not
drawn so as to be payable at any interest-bearing period,
and I went to see why they should place us in a position
that in the event of death we would have nothing to show
we owned the property." Defendant then said that he
needed more money for the building, and that unless he
had a waiver from complainants he couldn't get any more
money, and witness replied, "We will never sign anything
of that kind." Defendant further said, "I am only doing
this for your good; I am only holding this in trust for
you, and whatever you sign here will not interfere with
the trust I am holding; it is only to further these negotia-
tions of the loan for that building." Defendant brought the
paper, or a similar one, on two later occasions but witness
refused to sign it. Later the tenants began to move out
of the building, and witness then went to defendant's office
and said to him: "Why, Mr. Lehmann, what does this
mean—these tenants moving out of here? We don't want
to have this building vacated until we have all the arrange-

ments we are going to make to reconstruct this property perfected; I have fully decided, since we do not consider a new building would pay here, to reconstruct this property, and I do not see why you are presuming to vacate this property here until we are ready for the reconstruction." He said, "I thought we would be ready by the first of March," and witness replied, "We will never be ready by the first of March now," and Lehmann then said, "I will speak to them about it." On a later occasion witness asked him to state the amount he had actually loaned complainants on this property, and he said $50,000 was the amount he paid towards the Webb loan, $2700 commission to Springer, $1500 to the Chicago Title and Trust Company for guaranteeing the title, together with about $1600 for other purposes. Witness then said, "Now, Mr. Lehmann, that is actually what you are out in here, aside from the $5000 commission I agreed to pay you?" and he replied, "Oh, there may be some other little things more or less, but those are about the right figures." Witness said, "You are willing to take that and deed back our property you are holding in trust, with $5000 I agreed to pay you?" and he said he would. The question of how much time defendant would give witness to close this deal was then discussed and the time fixed was to be not less than thirty days. Witness further testified that the rents received on the building were something over $700 a month, and that defendant had loaned her in cash and checks about $1350.

Robert T. Newberry, a Chicago architect who had prepared building plans for complainants, testified that complainants and defendant came into his office in 1913 and that complainant Dorrance said, "After all our troubles and tribulations we have arrangements made and are going ahead with the building;" that she introduced defendant to him, stating: "This is Mr. Lehmann, of Peoria, who is going to help us out; can you get a set of the plans and specifications you have prepared for this build-

ing and explain to Mr. Lehmann about it?" Witness further testified that he brought forth his plans and specifications and laid the same before defendant; that during the conversation the complainant Dorrance stated that defendant was going to be a trustee and hold the title of the property for them; that he was going to make a loan and advance all the necessary money to remodel the building according to his (Newberry's) plans, and that she stated that they were going from there over to the office of the Massachusetts Life Insurance Company to see Mr. Springer and asked to take the plans along; that during this conversation defendant said: "I am going to look into the matter and see if the thing is all right, and wish you would explain to me what you propose to do with reference to the building,—how much of it is to be new and how much of the old building you are going to utilize; I want you to tell me all about it." He further testified that prior to this time a loan had been negotiated with the Equitable Life Insurance Company for $25,000, but that this loan did not materialize because of the sudden death of Paul Morton, head of the company.

John D. Gray, an attorney practicing in Chicago, testified that the lease executed between defendant and complainant Kelly was shown to witness by Kelly, and Kelly inquired whether he should sign the same. Witness merely glanced over it, and after asking defendant if it was the same paper that Kelly signed for Webb, and after being advised by someone present that it was, he told Kelly to sign it. He further testified that he was cognizant of the transaction between complainants and Webb, and he was advised by complainants beforehand as to the negotiations between them and defendant; that he could not recall the exact details of defendant's refusal to sign anything that amounted to a declaration of trust, and that defendant stated in order to secure the money he obligated himself,

and that he was the owner and that complainants were not the owners; that defendant said he was under obligations to not sign his name to anything that would impair his title. The witness further testified that he prepared a declaration of trust at complainant Dorrance's suggestion, and that when he handed it to defendant, as witness recollected, defendant stated to someone there that he would promise to treat these people right or do something for them, or some expression of that kind, but that he didn't say what it was he expected to do, and that witness did not recall exactly what defendant said as to why he would not sign the paper; that other conversations were had with defendant with reference to signing the trust agreement, but he (defendant) said it was not the understanding and refused to sign it; that defendant said, "If I put on record what I expect to do for these people it will be a detriment to my financing this building;" that these various conversations were had both before and after defendant had begun to tear down the building.

B. F. Reynolds, vice-president of the United Cigar Stores Company, testified that he was introduced to defendant by complainant Dorrance as the man they were negotiating with to take the property and handle it for them, and stated defendant understood all the conditions down there and felt complainants were being abused and imposed upon and was going to see them through their building program; that this was just prior to defendant's going down East to see the insurance company; that complainant Dorrance said that he (referring to defendant) was going to negotiate the loan and put a certain amount of money additional to what he got from the insurance company and take title to the property; that, as witness recollected, defendant was to receive $5000 for doing this. Witness further testified that the deal that was talked of was to pass the title to defendant so he could get the money from the insurance company, and that the title deed was

to be put in trust in some way so that complainant Dorrance could pay him back and get the title.

George W. Caldwell testified that he was a contractor; that he knew complainants and defendant; that in December, 1913, while in Peoria, he saw complainants and defendant; that he had met complainants in Chicago a short time prior to that time and negotiated with them to build and finance a building in Peoria, and that at the time he came to Peoria he had the matter well under headway; that he asked complainants if they had the matter in shape so they could obtain title and give a clean abstract to the property, and they said they had; that defendant stated that what he had done for them was an accommodation; that he was holding the property in trust, and that he was ready to take his money, with interest, at any time he could get it; that witness told him it would probably require a little time, and he said he was willing to give a little time; that when defendant made the remark that he was simply doing what he did as an accommodation and holding the property in trust for them and would take his money whenever he could get it, complainant Dorrance said, "And we agreed to pay you $5000," and he replied: "I don't want that, though; all I want is my money back and the interest; I will be satisfied with that if I can get it; I want to help you folks out." He further testified that defendant stated that the title was put in his hands because the insurance company that was making the loan wanted the title in stronger hands, and that is why it was done; that witness saw complainants and defendant on later occasions, and defendant said his interest was simply an accommodation and that he was ready to do everything he could to help them out; that the following March he met defendant and complainant Dorrance, and defendant handed complainant Dorrance a picture, stating that it was one of a building he proposed to erect upon the lot; that she inquired who prepared the plans, and when advised that a local firm of

architects had prepared them she objected, and stated to defendant that he knew witness had been working on the plans for two or three months; that defendant then said if they would pay him his money and $10,000 he would get out, and to this complainant Dorrance replied, "No, we have only agreed to pay you $5000, and that we will pay you," to which defendant replied : "I have obligated myself some in this matter; I have some promises out about elevators and some promises to a firm of contractors here," to which she replied, "Do you mean you have let the contract?" and the defendant then stated that while he hadn't exactly let the contract he had talked about it.

. Franklin D. Kelly, the other complainant, testified that he had lived in Peoria over thirty years; that he had practiced dentistry not only in this country but in Europe. He further testified as to his transactions with the various persons up to the time of the deal whereby he deeded the property to the First Trust and Safe Deposit Company. He testified to the meeting with defendant at the time Caldwell and complainant Dorrance were present and when defendant asked $10,000 for his trouble and complainant Dorrance stated he had agreed to take $5000; that after the deed was made defendant was in his office several times before he brought the photographs showing the building he proposed to put up; that on one occasion he and complainant Dorrance figured with defendant on the amount of money defendant had put in, which, as witness remembers, was $58,000, and that defendant said if he could get what he had put in he would take the note of complainant Dorrance for $5000 which she was to give him when he made the loan; that at no time in his presence did defendant claim he held the absolute title to this property until witness received the paper which was a demand to vacate the premises; that when witness signed the lease which defendant asked him to sign he stated it was only a matter of form so he might make the loan from the Massachusetts Mutual,

and as witness had asked Gray, his attorney, if it was all right and was told it was, he signed it. He further testified that defendant said he would not have to pay any rent and that he has paid no rent; that the lease was made so it would please the Massachusetts Mutual; that after the deed was made, and up until the building was torn down, witness and complainant Dorrance collected the rents for the second floor and paid the bills and kept up the improvements on the building; that defendant never talked to him about giving him an annuity out of the property or giving him any dividends, stocks or bonds, and neither did he ever mention to witness the matter of the redemption of the homestead of complainant Dorrance on Moss avenue; that the first witness ever heard of the annuity was when defendant testified in regard to the same on the stand in this case; that there was nothing said prior to the making of the deed in August by defendant about a redemption of the Moss avenue property being a part consideration of the deed; that at the time he delivered the deed in question, in August, he did not understand the same to be an absolute conveyance but that it was in the nature of a mortgage, and that had he understood it to be an absolute deed he would not have executed and delivered it; that complainant Dorrance owned a half interest in the real estate involved in this suit although the record title was taken in his name. The answer of defendant filed in the circuit court of Peoria county at the December term, 1895, in the Holland suit, was then shown to witness and he was asked if he filed the same in this cause, to which he replied, "I don't remember." As we have said, this answer, among other things, denies that witness was the owner or in any way or manner interested in said real estate therein described, which is the identical real estate involved in this suit. Witness further testified that defendant stated he did not want anything put on record showing it was the property of complainants until he got the money

297—4

and that he would deed it back to them; that it was about the middle of August when defendant stated he would give complainants a paper showing their interest in the property if he got the money from the Massachusetts Mutual; that he stated this both before and after witness signed the deed; that witness believed what was said or he would not have signed the deed; that between the date of giving the deed in August, 1913, and the time when defendant brought the photographs of the proposed building to the office of witness in December or January following, he was in the office two or three times a week; that on these occasions witness requested defendant to give them the paper showing their interest in the property but that he always made some evasive answer.

Eugene F. Baldwin testified that he had lived in Peoria fifty-two years and was a newspaper man; that he knew complainants and defendant; that he talked with defendant with reference to the property in question, and defendant stated that he made a provision for complainants giving them $1800 a year as long as they lived, and that he was to take up the mortgage on the Moss avenue property and give them an office in the new building; that this was about August, 1913. He further stated that he had advanced some money and had taken title to the property. Defendant also told witness a great many times he was sorry he got into the business, and that if he could get his money out of it he would be willing to quit.

Jacob P. Schnellbacher, a neighbor of complainants, who has resided in Peoria thirty-three years and knows the defendant, testified that defendant told him there was in the neighborhood of $58,000 due him, which was the amount he had advanced on this property; that he wanted to get his money out; that there was $2700 due Springer, $1000 due the Chicago Title and Trust Company, $1600 taxes, the interest on the $100,000 loan to the insurance company and on the $50,000 he had invested, and $500 in-

surance; that he stated he had loaned complainant Kelly on different occasions $392, and on different occasions had loaned complainant Dorrance $1500; that he had received $750 for the building material from the wreckage and had collected $2200 in rents, for which he would give complainants credit in case of settlement; that he showed these figures to complainants, and that afterwards he saw defendant and advised him he could get a settlement with complainants and inquired how much time he would give them, and that he replied fifteen to forty-five days; that all he wanted was his money; that defendant stated he would take $58,842 and get out; that witness stated to him, "Lehmann, you fell into the trap the same as was offered me to carry this title for $5000," and that he made no reply.

Edwin Lehmann, the defendant, was called as a witness by complainants. He testified that Springer refused to make a loan on the property if there was to be any equity reserved to complainants, and that at a meeting arranged with complainants Springer told them the company would not loan to trustees or where there were any reservations and that he (Lehmann) must have the absolute title before the loan could be made, and that complainants agreed to this; that he told complainants he would look after them and see that they did not want for anything if the venture proved profitable, and that that was part of the consideration for the property; that Hopp, of the Chicago Title and Trust Company, demanded that the relationship of landlord and tenant exist between witness and complainants before his company would guarantee the title, and that a lease was then executed from the witness to Kelly for a part of the property at a rental of one dollar a year; that the first he learned that complainants claimed any interest in the property was when they served on him a notice of ownership and filed the same in the recorder's office, but he admitted that prior to that time he had been asked by attorney Gray to sign a certain trust agreement. He further testified that

he had planned to take out a life annuity or to secure some interest-bearing bonds for the care of complainants during their lifetime if the venture proved profitable, but that he did not remember whether he ever advised complainants of either of these plans. He testified that he received $2950 in currency from complainant Dorrance which she secured from Webb, and that at her request he gave her $100 of the amount and then gave her a receipt for $2850. He further stated that during the negotiations he met complainant Kelly at the Otis building, in Chicago, and told him he would attend to the financing of the project if he could do it, but that he would not be hampered with any strings tied to him and that he must have a free hand and absolute control; that Kelly replied: "Mr. Lehmann, the proposition is up to you; you take the property and control it absolutely and do as you like and go ahead with the project; it is up to you entirely." He further testified that about January or February, 1914, negotiations took place between complainants and himself toward adjustment of differences, but that he never gave complainants any figures with reference to the amount of money he had invested in the property. He fixed the value of the property in question at between $160,000 and $170,000. Other witnesses for complainants fixed the value of the property at from $225,000 to $300,000.

In his own behalf defendant testified that he purchased the property outright from Webb and that he took the title in fee simple; that he did not loan any money to complainants and that they were in no way indebted to him, and that he was not holding the property as security for any debt. He further testified that in consideration of complainants transferring to him their option to purchase the Old Library building he had agreed to redeem their Moss avenue homestead, and had agreed to provide them funds from time to time as in his judgment seemed proper if the building venture proved profitable to him; that he had

from time to time furnished complainants with funds, and that he had redeemed the Moss avenue homestead and had permitted complainants to live there without expense. He denied practically all the testimony of complainants and of complainants' witnesses which tended in any way to show that the money invested by him in this property was a loan to complainants and that he held the title to the property as security for such indebtedness. He testified that during negotiations complainant Dorrance showed him a lease executed by the United Cigar Stores Company and by Dorrance; that the lease provided that the company should pay $25,000 a year for the first five years and $30,000 a year for the next five years for the entire first floor of the Old Library building. A reference was made to Exhibit A as being part of the lease, but when the lease was shown to defendant Exhibit A was not attached. Complainant Dorrance reported to defendant that this lease to the United Cigar Stores Company was a valid and binding lease and that it would enter into possession of the first floor of the building if it were repaired or of the first floor of a new building erected on the same property. After defendant had obtained the property and was involved in the enterprise to the extent that he could not well retrace his steps he went to the company to have a proper lease executed between it and himself. For the first time his attention was called to Exhibit A, which was attached to the copy in the possession of the company but was not attached to the copy which complainant Dorrance had shown to him. Exhibit A provided that the company was to be in no way liable for the rent specified in the lease unless it collected that amount of rent from the sub-tenants, and that the company was to occupy the corner store room and was to sub-let the other store rooms on the first floor and in the basement. It was to collect these rents and was to pay the rents collected from the remaining store rooms and the basement to the lessor whether the amount was more or less than the rental

stated in the body of the lease. In short, the lease was a serious liability rather than an asset, because it gave the company the corner store room rent free for ten years and guaranteed no rent from the remainder of the first floor and basement.

George W. Springer testified to a series of conferences with complainants regarding a loan to them and his company's refusal to make the loan. He testified that the United Cigar Stores Company's lease was exhibited to him in an effort to get the loan; that he visited Peoria while the negotiations between complainants and defendant were in progress, and that he told complainants that no loan would be made on the property unless the title was vested in defendant in fee simple, and that there could be no title in trust and no verbal or written agreement as to any trust, and that complainants agreed to this arrangement. He also stated that there was some conversation between the complainants and defendant about the redemption of the Moss avenue homestead. He denied all the material parts of conversations related by complainant Dorrance in her testimony, denied that she told him to make the loan to defendant payable at any interest-bearing date, and denied that she stated that the loan did not suit her and that she was going to pay it off as soon as possible. He is corroborated in this by Henry W. Hopp, representative of the Chicago Title and Trust Company.

Arthur Lehmann, brother of defendant, testified that he was present during part of the negotiations and that he heard Springer refuse to make the loan from the insurance company if any trust was involved, and that he heard complainants say that the deed was absolute and that there were no reservations. He further testified that defendant stated to complainants in his presence: "There is one thing that I want my brother to know, and that is, I am to take care of the mortgage on the Moss avenue home," which amounted to something around $7200.

E. R. Grimson and Walter A. Causey, both real estate dealers, George J. Jobst, a contractor with whom defendant had negotiations about the construction of the proposed new building, and Edward C. Leisy, a business man of Peoria, all fixed the value of the property in question at $165,000.

While the earlier transactions of complainants with respect to this property will not be controlling in the decision of the issue here presented, counsel have devoted much space to a discussion of the title conveyed in former transactions, and we will notice such part of the discussion as we consider in any way controlling of the question before us.

Complainants contend that the First Trust and Safe Deposit Company had no legal existence and that the conveyance by it to Webb was void, and that such title as Webb had to the property was an equitable title held by him as security for money advanced by him to satisfy the obligations of the complainants. This contention cannot be sustained. The deposit company was organized for the purpose, among others, of engaging in the business of operating safety deposit boxes. This purpose is a lawful one, (*Rector* v. *Hartford Deposit Co.* 190 Ill. 380; *McIlvaine* v. *Foreman,* 292 id. 224;) and whether the corporation abused the power given it by its charter is a question that the State, only, may raise. For the purposes of this case we must hold on this record that the deposit company was a valid corporation and that it conveyed by its warranty deed to Webb the fee simple title to the property in question. For failure to file its annual report with the Secretary of State that officer entered upon his records a cancellation of the charter of the deposit company, but that does not, of itself, work a forfeiture of the corporation's charter but it is simply *prima facie* evidence of non-user, which may be availed of by the people in a proceeding to forfeit the charter. *People* v. *Rose,* 207 Ill. 352.

It is earnestly contended by complainants that Webb was a mortgagee and that he held title to this property as security for the payment of a debt owing by complainants to Webb. The burden is upon the party alleging that an instrument purporting to be a deed is, in fact, a mortgage, and it must be established by clear, satisfactory and convincing proof. (*Rankin* v. *Rankin,* 216 Ill. 132; *Deadman* v. *Yantis,* 230 id. 243; *Novak* v. *Kruse,* 288 id. 363.) A full discussion of this subject will be found in an annotation in L. R. A. 1916B, at page 192. In determining whether the transaction consummated by the deed from the deposit company to Webb was an absolute sale or should be regarded merely as a mortgage we entirely disregard the testimony of those witnesses introduced for the purpose of establishing their understanding of the nature of the transaction and who relate conversations of the parties. The conveyance purports to convey an absolute estate to the grantee, and it must be taken as the exponent of the rights of the parties unless some equity is shown not founded on the mere allegation of a contemporaneous understanding inconsistent with the terms of the deed but independently both of the deed itself and of the understanding with which it was executed. The right to redeem lands so conveyed cannot be established by simply proving that such was the understanding on which the deed was executed, because equity as well as the law will seek for the understanding of the parties in the deed itself. The right must be one paramount to and independent of the terms of the deed as well as of any understanding between the parties at the time it was executed. Parol evidence is admissible so far as it conduces to show the relations between the parties or to show any other fact or circumstance of a nature to control the deed and to establish such an equity as would give a right of redemption, and no further. In the application of this rule parol evidence is received to establish the fact that a debt existed or that money was loaned on

account of which the conveyance was made, for such facts will in a court of equity control the operation of the deed. So, too, in regard to any other fact or circumstance having the same operation. (*Sutphen* v. *Cushman,* 35 Ill. 186; *Knowles* v. *Knowles,* 86 id. 1.) All the negotiations between complainants in their own behalf and in behalf of the deposit company, which they controlled, and Webb, were conducted in writing, and it was specifically and clearly stated in the letters passing between the parties that this transaction was a sale and that the instrument of conveyance was not a mortgage, and that there was no debt existing between complainants or the company and Webb, and that the lease of the property with an option to purchase was not in any way to be considered as security for any indebtedness. Since deeds take effect from their delivery, the character of an instrument as a deed or mortgage becomes fixed at that time. (*Bearss* v. *Ford,* 108 Ill. 16.) Complainants were, so far as this record shows, in full possession of all their mental faculties at the time of this transaction, and it must be presumed that they meant what they said when they signed letters emphatically stating that the instrument delivered to Webb as a deed was an absolute conveyance. If it was an absolute conveyance then,—and we hold that it was,—it remained an absolute conveyance as long as Webb held the title. The fact that he extended complainants' option to purchase the property from April to November does not change the character of the original conveyance. He increased the option price from $137,000 to $150,000, and agreed with complainants that if they were unable to exercise the option and purchase the property at the end of the option period, he would give them an additional $3000. They were given the privilege of withdrawing this $3000 at any time before or after the expiration of the option period, with the understanding that if the $3000 was withdrawn before the option was exercised, then it should be added to the option price if they later

purchased the property. This accounts for the option price being fixed at $153,000 and accounts for the $3000 passing from Webb through complainants to defendant and from defendant back to Webb at the time defendant exercised the option. While this transaction regarding the $3000 is somewhat unusual, it is not sufficient to attach to a deed, absolute on its face, the character of a mortgage. We hold, therefore, that at the time the negotiations were pending between complainants and defendant, Webb held the absolute title to the premises in question subject to an option in favor of complainants of a right to re-purchase.

We come now to consider the question before us for decision,—the character of the title held by defendant. As we have seen, he took an assignment of complainants' option and exercised the option by paying to Webb the purchase price fixed by the option agreement. Webb conveyed to defendant his title to the premises, which title we have already held was a fee simple title. How, then, can it be said that the deed from Webb to defendant is a mortgage? To fix upon a deed absolute in form the character of a mortgage it must be shown to have been intended as a security in the nature of a mortgage, and to hold such deed a mortgage a valid subsisting obligation must be shown, the performance of which the deed was intended to secure. There must be a continuing valid indebtedness secured by it which may be enforced in an action at law, or it is not a mortgage whatever else it may be. (*Rue* v. *Dole,* 107 Ill. 275; *Batcheller* v. *Batcheller,* 144 id. 471; *Carpenter* v. *Plagge,* 192 id. 82.) A mere option to re-pay the purchase money and receive a conveyance of the property will not convert a conveyance absolute in terms into a mortgage. (*Caraway* v. *Sly,* 222 Ill. 203.) The only evidence of a debt existing between complainants and defendant is the testimony of complainants. This evidence is disputed by testimony of defendant, Springer and Hopp, and by the deed itself and most of the circumstances surrounding the

transaction. The evidence tending to establish this debt is not that clear, satisfactory and convincing proof that the law requires. Inasmuch, therefore, as the evidence does not establish a debt existing between complainants and defendant the deed cannot be held to be a mortgage, because there is no existing debt or obligation which the grantee in the conveyance can enforce by foreclosure proceedings. (*Friend* v. *Beach,* 276 Ill. 397.) The right to redeem and the right to foreclose are reciprocal, and where the right to foreclose does not exist there is no right to redeem. *Fitch* v. *Miller,* 200 Ill. 170; *Caraway* v. *Sly, supra.* See, also, annotation in L. R. A. 1916B, p. 378.

If the position of complainants is that defendant was to purchase this property with his own funds and credit and hold it in trust for them until they could at some later date pay defendant the amount he had invested with interest and thereby secure a conveyance of the property to themselves, such an agreement would be an express trust, and the Statute of Frauds set up in the answer is a complete defense because the trust was not declared in writing. (*Godschalk* v. *Fulmer,* 176 Ill. 64; *Lancaster* v. *Springer,* 239 id. 472; *Stubbings* v. *Stubbings,* 248 id. 406; *Delfosse* v. *Delfosse,* 287 id. 251.) There was no resulting trust for the reason that complainants did not pay any part of the consideration for the premises. A resulting trust cannot arise from any verbal agreement between the parties or verbal declaration at the time of the purchase, but it arises from the fact that one person has paid the consideration, or some aliquot part thereof, as a part of the original transaction at the time the purchase was made and the title has been taken in the name of another. (*Plummer* v. *Flesher,* 246 Ill. 313; *Wells* v. *Messenger,* 249 id. 72.) A naked promise by defendant to buy the property in his own name, pay for it with his own money and hold it for the benefit of complainants could not be enforced in equity. *Heaton* v. *Gaines,* 198 Ill. 479.

There is a difference of opinion among the witnesses who fix the value of this property, but we cannot say that from a consideration of all the evidence the price paid was grossly inadequate. As the land did not pass from complainants to defendant we do not see how the price is to weigh much in determining the issue presented. We do not regard complainants' evidence concerning this transaction as sufficient to overcome the equally positive evidence of defendant, supported as it is by the absolute form of the deed, the testimony of Springer and Hopp, and the fact that no written evidence was made either of a condition of defeasance or of the existence of a debt. There is no testimony given by an entirely disinterested witness, conclusive in its character, as to what the transaction was. Complainant Dorrance indulged in much loose conversation and self-serving declarations in her dealings with defendant and other parties interested, who are witnesses in this case. It would be rather unsafe to turn the ship of justice adrift amidst the treacherous waves of loose conversation, to be guided only by the imperfect understanding, recollection and statement of witnesses, and we choose to follow that safer rule adopted from the experience of ages, that a deed absolute in form will be held to be what it purports to be unless the contrary intention is established by clear, satisfactory and convincing proof. In our opinion the undisputed facts,—the absolute form of the deed, the absence of any written evidence of indebtedness, the absence of any fixed time for the re-payment of the money, and the failure to agree upon a rate of interest or any annual rental value of the property,—so strongly corroborate the evidence of defendant that the preponderance is decidedly with him.

It is contended earnestly by complainants that it is absurd and unreasonable to consider that they would give up this valuable property for the uncertain promises of defendant. As we view the record, complainants had nothing to

give up. They were, to use a homely expression, at their rope's end. They had tried from all known sources to obtain financial assistance to enable them to re-purchase and to repair or re-build this property. They were about to lose the Moss avenue homestead, and if the option period expired they would lose all right or interest in the Old Library building. Lehmann promised them the only alternative. The venture was speculative, and Lehmann was not willing to make any definite agreement to provide complainants with support. He agreed to take care of the indebtedness on the Moss avenue homestead and if the building venture proved profitable to see that complainants would not suffer for lack of funds. We appreciate that this arrangement is indefinite, and if complainants had been able to make better arrangements it would have been absurd for them to have assigned their right to exercise the option for this indefinite and uncertain consideration. On the other hand, it is not within the line of ordinary experience that a man having money to loan for interest is willing to loan it without a fixed rate of interest and to be re-paid at the mere pleasure of the borrower. If, as we understand complainants, they were simply to have the right to have this property conveyed to them whenever they re-paid the money defendant had invested, it is not perceived how defendant could ever have enforced re-payment by a suit at law on the loan or by a bill to foreclose, treating the deed as a mortgage. The debt would only mature by complainants electing to extinguish it, and before maturity its payment could not be enforced. It seems to us to be so clear that an arrangement of this character would be so undesirable to the lender that any degree of prudence would forbid it. The chancellor properly held that defendant held the title to the property known as the Old Library building in fee simple.

The moving consideration from defendant to complainants which impelled them to assign the option to purchase

was the assurance that their right to occupy the Moss avenue homestead would be protected by defendant and that defendant would from time to time contribute to their support. The promise of contributions was, to be sure, dependent upon the success of the building venture, but the complainants had such faith in the success of the proposition that they relied upon the promise of support as a certainty. We are impressed with the injustice of confirming the title to this valuable business property in defendant without definitely establishing the equitable rights of complainants. · We hold that the right of complainants to occupy the Moss avenue homestead and the right of complainants to contributions for support from defendant, all of which defendant says was the moving consideration passing between the parties at the time he obtained title to the Old Library building, are rights that equity will enforce and that the decree ought to determine these rights under the general prayer for relief. For this reason the bill should not have been dismissed for want of equity, but the chancellor should have considered and determined the rights of complainants and should have established them by the decree.

The judgment of the Appellate Court and the decree of the circuit court are affirmed in so far as they hold the title of defendant to be in fee simple, but the judgment and the decree are reversed and the cause is remanded to the circuit court of Peoria county, with directions to fix by the decree the right of complainants to occupy without expense to them the Moss avenue homestead until the death of the survivor of them, and to consider and determine what in equity and good conscience defendant ought to contribute annually to the support and maintenance of complainants.

*Reversed in part and remanded, with directions.*

Mr. JUSTICE STONE took no part in this decision.